**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRIAN STORY,                 ) | |
|          ) | |
|       Plaintiff,     ) | Case No. 19-cv-2476 |
|          ) | |
| v.               ) | Hon. Steven C. Seeger |
|          ) | |
| THOMAS DART, Sheriff of Cook County, ) | |
| and COOK COUNTY, ILLINOIS,   ) | |
|          ) | |
|       Defendants.    ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brian Story had a toothache when he was a pretrial detainee at Cook County Jail. An old filling fell out, and it caused a lot of pain. As it turns out, the tooth needed extraction, and that tooth wasn't alone. A few other decaying teeth needed extraction, too. But Story had to wait more than a month for his teeth to get pulled.

The delay wasn't caused by the inability to see a dentist. In fact, Story saw a jail dentist right after he lost his filling. But the jail dentist didn't pull his teeth because Cook County Jail has a policy of referring certain procedures – including some tooth extractions – to off-site oral surgeons at Stroger Hospital. That's what happened to Story. The jail dentist referred Story to the hospital for the procedure, and gave him pain medication in the meantime.

Story's extraction at Stroger Hospital took place weeks later. In the end, Story had to wait 39 days before an oral surgeon at Stroger Hospital removed his teeth. In the meantime, he waited, and the waiting was painful.

Story ultimately sued Cook County Sheriff Thomas Dart and Cook County for deliberate indifference to his serious medical needs under section 1983. He argues that the jail's referral

policy led to the delay in receiving a tooth extraction and caused him significant unnecessary pain in violation of the Fourteenth Amendment.

Sheriff Dart and Cook County moved for summary judgment. For the reasons that follow, the Court grants Defendants' motion.

## Background

Plaintiff Brian Story was a pretrial detainee at the Cook County Jail. *See* Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s L.R. 56.1 Resp."), at ¶ 1 (Dckt. No. 76). Before getting to the toothache at the heart of this case, the Court will recount some history of the dental care policy at Cook County Jail.

## I.      Cook County Policies

Sheriff Thomas Dart is responsible for the operation of Cook County Jail, and Cook County is responsible for detainees' health and well-being. Cermak Health Services, a division of Cook County, provides medical and dental care for the inmates.

Before March 2007, Cook County Jail had an on-site oral surgeon and six on-site dentists. *See* Defs.' Resp. to Pl.'s Statement of Undisputed Facts ("Defs.' L.R. 56.1 Resp."), at ¶ 8 (Dckt. No. 79). During that period, an oral surgeon evaluated inmates with urgent dental care needs on-site, meaning on Cook County Jail's campus, and within seven days. *Id.*

At some point long before Story's incarceration at the jail, a reduction in staff left the facility with no on-site oral surgeon. *Id.* at ¶ 9. The jail was unable to recruit an oral surgeon because the budgeted position was more appropriate for a dentist. *Id.* As a result, the County enlisted a third-party provider for certain oral surgery needs, including certain tooth extractions, that a jail dentist could not complete on-site. *Id.* at ¶ 10.

In other words, the County outsourced oral surgery by replacing its on-site oral surgeon with an off-site oral surgeon. It began referring inmates needing certain oral surgeries, including some tooth extractions, to Stroger Hospital ("Stroger"). *Id.*

The new referral policy did not mean that no teeth were pulled at the jail. The parties agree that jail dentists could continue to do some, but not all, tooth extractions on-site. *See* Pl.'s L.R. 56.1 Resp., at ¶ 12 (Dckt. No. 76).

But beyond that common ground, the parties dispute exactly which extractions required referral. Plaintiff asserts that an on-site dentist could perform extractions at the jail, at least on some occasions. *Id.* at ¶ 13; *see also* Fegan Dep., at 95:3-23 (Dckt. No. 76-2). But he doesn't specify which extractions a jail dentist could do.

Defendants point out that a jail dentist could refer a patient to Stroger for an extraction by an oral surgeon for a few different reasons. The extraction might fall outside the skillset or training of the dentist. Or, maybe the detainee would be better served by a specialist in a hospital environment for some other reason. *See* Pl.'s L.R. 56.1 Resp., at ¶ 13 (Dckt. No. 76); Alexander Decl., at ¶ 9 (Dckt. No. 74-3).

The parties agree that when a detainee did not have an emergency condition, the jail dentist would enter a routine referral for an extraction at Stroger Hospital. *See* Pl.'s L.R. 56.1 Resp., at ¶ 14 (Dckt. No. 76). A dentist would place the referral order in Cerner, the electronic medical records system used by Cook County Health. *Id.*

But the parties dispute *how* the referral process worked. Story contends that only one method of referral existed. As Story tells it, the jail dentist entered a routine electronic referral in the electronic medical records system used by Cook County Health, and a Stroger clerk scheduled an oral surgery appointment. *Id.* at ¶ 14; *see also* 8/2/18 Taylor Dep., at 68:17-21

3

(Dckt. No. 76-4) (Q: "As a dentist working for Cermak, do you have the ability to call over to the Stroger oral surgery department and expedite a person to receive an extraction?" A: "No.").

From that point on, according to Story, it was out of the jail's hands. *See* Pl.'s L.R. 56.1 Resp., at ¶ 14 (Dckt. No. 76). The jail dentist had no control over when the inmate would have an extraction at Stroger. The inmate simply had to wait to be scheduled by a Stroger clerk. *Id.*

Dart and the County point out that there were other ways into Stroger, too, beyond an electronic referral in Cerner. According to Defendants, if the detainee's needs were urgent, the dentist could personally escalate a referral through Cermak's scheduling department at Cook County Jail. *Id.* at ¶ 18; Alexander Decl., at ¶ 10 (Dckt. No. 74-3). Dentists could contact either Laura Hernandez, the Cermak clerk who handles expedited surgery requests, or Dr. Jorelle Alexander, the Chair of the Department of Oral Health for Cook County Health, to escalate a referral. *See* Alexander Decl., at ¶ 10 (Dckt. No. 74-3).

Additionally, both parties agree that a patient could take the emergency route to Stroger. Detainees with emergent conditions could be transported to the Urgent Care Clinic at the jail, and from that point they could ultimately end up at the Emergency Department at Stroger where an oral surgeon was always on call. *See* Pl.'s L.R. 56.1 Resp., at ¶ 20 (Dckt. No. 76); Alexander Decl., at ¶ 11 (Dckt. No. 74-3).

The parties dispute how soon an oral surgeon at Stroger Hospital saw detainees after receiving a referral. According to Defendants, a detainee could wait up to 90 days to see an oral surgeon at Stroger after the submission of an electronic referral. *See* Pl.'s L.R. 56.1 Resp., at ¶ 15 (Dckt. No. 76)

Plaintiff, however, thinks the wait could be longer. He points to testimony from Dr. Mohammed Qaisi, the oral surgery residency program director at Stroger Hospital. He testified

4

that detainees waited between two weeks and fourth months, or possibly even longer, to receive an appointment. *Id.*; *see also* Qaisi Dep., at 61:6-23 (Dckt. No. 74-5).

Finally, the parties disagree about whether the jail's transportation practices also play a role in delaying treatment at Stroger Hospital. According to Story, the jail's transportation policies limited the number of detainees who could travel to Stroger every day. *See* Defs.' L.R. 56.1 Resp., at ¶ 13 (Dckt. No. 79). Specifically, the jail could transport only twenty total inmates a day – ten in the morning, and ten in the afternoon. *Id.*; *see also* 4/8/16 Alexander Email, at 1 (Dckt. No. 76-10) ("Cermak is only allowed to move 10 patients in the am and 10 patients in the pm for transport to Stroger and we (dental) are lucky to get a spot or two out of the ten especially when there are more pressing medical needs.").

But Defendants presented countervailing evidence that issues with inmate transportation did not pose a barrier to dental care. *See* Pl.'s L.R. 56.1 Resp., at ¶ 30 (Dckt. No. 76); *see also* 12/18/20 Alexander Dep., at 168:10 – 169:2 (Dckt. No. 74-6) ("I'm not aware of any time where transportation didn't occur and patients missed care because transportation didn't happen.").

## II.  Plaintiff's Toothache

With that background in mind, the Court returns to Plaintiff's toothache. On November 5, 2018, Story was on his way to the gym when a filling came out of a tooth on the bottom left side of his mouth. *See* Pl.'s L.R. 56.1 Resp., at ¶ 31 (Dckt. No. 76). He told a jail sergeant, who immediately escorted him to the dentist's office in Division 10. *Id.* ¶ 32. A jail dentist, Dr. Brenda Taylor, saw him that day. *Id.* at ¶ 33.

Dr. Taylor determined that Story had several teeth that needed extraction. *Id.* at ¶ 38. She described Story as having "chronic rotten teeth," a pre-existing condition that Story had lived with for some time. *Id.* at ¶ 36.

For his part, Story testified that before his filling fell out that day, he "didn't have any pain or anything." *Id.* at ¶ 37; Story Dep., at 57:23 –58:6 (Dckt. No. 74-7). But his dentist, Dr. Taylor, opined that his teeth were in a sorry state before he entered Cook County Jail. *See* Pl.'s L.R. 56.1 Resp., at ¶ 37 (Dckt. No. 76); *see also* 2/24/21 Taylor Dep., at 206:3 – 207:3 (Dckt. No. 74-8). So, Plaintiff's teeth may not have been hurting before his filling fell out, but they weren't in great shape, either.

In any case, Story lost a filling, and it caused a great deal of pain. He complained to Dr. Taylor that he had a pain level rated ten out of ten. *See* Pl.'s L.R. 56.1 Resp., at ¶ 34 (Dckt. No. 76). So, Dr. Taylor prescribed him seven days' worth of antibiotics and a dosage of 800 milligrams of ibuprofen. *Id.* at ¶ 35.

Dr. Taylor did not extract any of Story's teeth during his November 5 visit. *Id.* at ¶ 38. Instead, Dr. Taylor made a referral to the oral surgery department at Stroger for extraction of three teeth on the bottom left of Story's mouth. *Id.* Specifically, Dr. Taylor referred Story for an extraction of teeth numbers 18, 19, and 20. *Id.*

Dr. Taylor testified that she made the clinical decision to send Story to Stroger based on what she observed in his oral cavity during her examination. *Id.* at ¶ 40. More specifically, she testified that she made a referral to Stroger because she considered Story's condition "routine," meaning "it's a situation that can be managed, and it can be handled in an oral surgery appointment versus an emergency." *See* 2/24/21 Taylor Dep., at 139:24 – 140:3 (Dckt. No. 74-8).

In other words, Dr. Taylor thought that Story's condition could wait to be addressed by an oral surgeon at Stroger Hospital. Story exhibited no swelling, difficulty speaking or swallowing, intrusion of the throat, or obstructions that would warrant emergency care. *See* Pl.'s

6

L.R. 56.1 Resp., at ¶ 39 (Dckt. No. 76). Dr. Taylor estimated that Story would be seen at the Stroger oral surgery clinic within four to twelve weeks. *Id.* at ¶ 41.

Story testified that he remained in pain after his first visit to the dentist, presumably because the bad teeth were still in his mouth. *See* Defs.' L.R. 56.1 Resp., at ¶¶ 37–38 (Dckt. No. 79); Story Dep., at 42:7-18, 51:17 – 52:1 (Dckt. No. 74-7). According to Story, the pain made almost everything more difficult. It left him sleepless, and it interfered with drinking. Story testified that he could "do nothing" because of it. *See* Defs.' L.R. 56.1 Resp., at ¶ 37; Story Dep., at 42:7-18. His mouth hurt constantly.

Story also testified that the pain medication that Dr. Taylor had prescribed did not provide any meaningful relief. He rated his pain at a seven out of ten, and he even resorted to putting a tissue inside the tooth to protect it from sensation. *See* Story Dep., at 36:19–37:9 (Dckt. No. 74-7).

Story tried several times to alert the jail of his severe and ongoing tooth pain. On November 14, 2018, more than a week after his first visit to Dr. Taylor, Story submitted a grievance explaining that he was out of pain medications and that his pain was "still at a ten." *See* Defs.' L.R. 56.1 Resp., at ¶ 30 (Dckt. No. 79); *see also* 11/14/18 Grievance, at 1 (Dckt. No. 76-19). He expressed concern that he did not know "how long it's going to be before [he] got this taken care of." *See* 11/14/18 Grievance, at 1.

On November 27, 2018, Story tried to tell the jail of his painful condition by submitting a Health Service Request Form ("HSRF"). *See* Defs.' L.R. 56.1 Resp., at ¶ 31 (Dckt. No. 79). He once again complained of pain rated ten out of ten. *Id.*; 11/27/2018 HSRF (Dckt. No. 76-18). And on December 3, 2018, Story submitted another grievance indicating that his pain was still a

"10." *See* Defs.' L.R. 56.1 Resp., at ¶ 32; 12/3/2018 Grievance (Dckt. No. 76-20). He saw no one in the meantime.

On December 6, 2018, just a few days after Story submitted his second grievance, he saw Dr. Taylor for the second time. *See* Pl.'s L.R. 56.1 Resp., at ¶ 43 (Dckt. No. 76). Story refused to have his teeth cleaned during that visit. *Id.* at ¶ 44. He testified that he was in too much pain to have Dr. Taylor clean his teeth. *See* Story Dep., at 40:1 – 41:4 (Dckt. No. 74-7). He wanted pain medication. *See* Pl.'s L.R. 56.1 Resp., at ¶ 44 (Dckt. No. 76); Story Dep., at 40:1-12.

At the same time, the record shows that Story refused to take his pain medication on several occasions. In fact, he refused taking the 800 milligrams of ibuprofen as prescribed on more than a dozen occasions. Specifically, he refused his pain medications – sometimes multiple times a day – on November 6, 7, 9, 10, 11, as well as on December 8, 9, 10, 11, 12, and 13. *See* Defs.' L.R. 56.1 Resp., at ¶ 37 (Dckt. No. 79); *see also* 4/21/21 Taylor Dep., at 127:4 – 134:5 (Dckt. No. 74-9).

Even so, as a result of the second visit, Dr. Taylor prescribed him another round of pain medications and antibiotics. She prescribed him seven days' worth of another amoxicillin-based drug and an 800-milligram dosage of ibuprofen. *See* Pl.'s L.R. 56.1 Resp., at ¶ 45 (Dckt. No. 76).

On December 14, 2018, thirty-nine days after his filling had fallen out, Story went to Stroger for oral surgery. *Id.* at ¶ 48. He was treated by Dr. Mohammed Qaisi. *Id.* at ¶ 49. Dr. Qaisi identified several decayed teeth in Story's mouth. *Id.* at ¶ 52. Specifically, he noted "Caries/Periodontal disease" on teeth numbers 18, 19, and 20. *See* Oral Surgery Output, at 2 (Dckt. No. 74-21).

Story's teeth were "broken," meaning they had fractured crowns, leaving only "the remaining root tips within the bone." *See* Qaisi Dep., at 52:3-23 (Dckt. No. 74-5). From Dr. Qaisi's perspective, the teeth were "periodontally hopeless." *See* Pl.'s L.R. 56.1 Resp., at ¶ 52 (Dckt. No. 76). He concluded that Story didn't "have any other option besides an extraction." *See* Qaisi Dep., at 53:10-11. So he removed the teeth that day. *See* Pl.'s L.R. 56.1 Resp., at ¶ 49.

Almost four months after surgery, Story filed suit against Defendants. *See* Cplt. (Dckt. No. 1). Discovery came and went. Defendants now move for summary judgment. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 73).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l*

*Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Story brings a Fourteenth Amendment claim about the adequacy of his medical care against Cook County and Sheriff Dart in his official capacity. An official-capacity claim is the same thing as a claim against the municipality itself. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). So *Monell* applies against both Defendants. *See generally Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

*Monell* provides the familiar framework for constitutional claims under section 1983 against a municipality. "Section 1983 creates a private right of action against any 'person' who violates the plaintiff's federal rights while acting under color of state law." *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). In *Monell*, the Supreme Court held that a municipality is a "person" within the meaning of section 1983. *See Monell*, 436 U.S. at 691–94.

But that conclusion came with a number of important limitations. A plaintiff with a *Monell* claim must overcome a series of hurdles, and surmounting them in succession is no small feat. "*Monell* liability is rare and difficult to establish." *See Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022).

Under *Monell*, a municipality is responsible for "*its own*" conduct. *See First Midwest Bank ex. rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (2021) (emphasis in original); *Monell*, 436 U.S. at 691–92. But a municipality is not on the hook for the misconduct of its

employees. There is no vicarious liability. *See Monell*, 436 U.S. at 694–95; *see also J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc) ("Time and again the Supreme Court has reinforced the strict prohibition against allowing principles of vicarious liability to establish municipal liability under § 1983.").

To prevail on a section 1983 claim against a municipality, a plaintiff "must challenge conduct that is properly attributable to the municipality itself." *See LaPorta*, 988 F.3d at 986. Three types of actions can give rise to liability: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *See Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).

The "critical question" is whether the municipality had a policy, practice, or policymaker that gave rise to the harm. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). The need for a policy, practice, or policymaker is about attribution – it ensures that it is appropriate to pin the conduct on the municipality itself.

Other "guardrail[s]" protect a local government from liability, too. *See J.K.J.*, 960 F.3d at 377. A plaintiff "must show that the 'policy or custom demonstrates municipal fault,' *i.e.*, deliberate indifference." *See Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 986). And then, a plaintiff must prove that the municipality's action was the "moving force" behind the violation. *See Monell*, 436 U.S. at 694.

11

The barriers posed by *Monell* are not mere formalities. They "'must be scrupulously applied' to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022) (quoting *LaPorta*, 988 F.3d at 987). The need for vigilance is important "where (as here) 'a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so.'" *Id.* (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997)). "In these circumstances a rigorous application of the proof requirements is especially important." *Id.*

Those *Monell* guardrails – municipal action (through a policy or practice), municipal fault, and "moving force" causation – are above and beyond the requirements of a constitutional claim in any run-of-the-mill case. As always, a plaintiff must prove an underlying constitutional deprivation. *See Bohanon*, 46 F.4th at 675; *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014); *Sallenger v. City of Springfield*, 630 F.3d 499, 504–05 (7th Cir. 2010). After all, if there is no underlying violation, then there is nothing to hold the municipality responsible *for*.

In sum, a plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *See Brown*, 520 U.S. at 404; *see also Dean*, 18 F.4th at 236 ("In short, a *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation."). "As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *See Brown*, 520 U.S. at 415 (emphasis in original).

All in all, defeating a summary judgment motion on a *Monell* claim is a steep climb over high hurdles. And here, Story does not get very far. The parties devote sizeable real estate to whether there was an underlying constitutional violation. The parties are correct that the need for a constitutional violation is a threshold issue. But there is a more straightforward way to resolve the case.

Viewed as a whole, the record could not support a finding by a reasonable jury that there was a widespread practice within the meaning of *Monell* of constitutional violations involving delayed dental care. And there is no evidence of deliberate indifference, either.

## I.      **Widespread Practice**

Story's claim falls short because he has not presented sufficient evidence that Defendants engaged in a widespread practice of denying dental care.

For present purposes, the Court assumes without deciding that Story suffered significant pain while he waited for his extraction at Stroger. But it is not enough to offer evidence that something bad happened to Plaintiff. To bring a claim under *Monell*, a plaintiff must show a policy, a widespread practice of constitutional violations, or a decision by a high-ranking policymaker. Story has not done so here.

Story's claim is about the delay he experienced in having his teeth extracted at Stroger Hospital after his initial visit with the jail dentist. *See* Cplt., at ¶¶ 25–26 (Dckt. No. 1). In total, he waited 39 days – from November 5 to December 14 – to have his teeth extracted.

He blames the delay on Defendants' policy of referring inmates to Stroger Hospital for off-site oral surgery. *Id.* at ¶ 26. "As the direct and proximate result of defendants' failure to hire an oral surgeon and failure to correct the obvious defects in their policy of providing off-site oral surgery, plaintiff experienced gratuitous pain and incurred personal injuries." *Id.* "This

causes patients to wait weeks, even months for treatment for significant pain." *See* Pl.'s Resp., at 4 (Dckt. No. 78).

Story does not claim that Defendants have expressly adopted an unconstitutional policy. He does not claim that the off-site referral policy is facially unconstitutional. Rightfully so – the Constitution may require jails to provide medical care, but it says nothing about where that care must take place. *See Kudla v. City of Hammond*, 2022 WL 2171229, at *9 (N.D. Ind. 2022) ("[T]his court is not aware[] of any authority finding that a short-term holding facility such as the Jail is constitutionally required to have on-site medical staff.").

Instead, Story alleges that Defendants have a *de facto* policy of delaying oral surgery. Those delays, Story argues, stem from the jail's dental equipment deficiencies, failure to hire an on-site oral surgeon, off-site referral policy, and inability to transport adequate numbers of detainees to Stroger hospital. *Id.* at 7–12. In other words, he alleges the off-site referral policy has been a failure. And he faults Defendants for not having an in-house referral procedure that would allow jail dentists to avoid referring an inmate to Stroger. *Id.* at 10.

A *de facto* policy claim falls under the "widespread practice" theory of liability. *See, e.g.*, *LaPorta*, 988 F.3d at 981. And when a plaintiff challenges gaps in a policy to support his claims, "he must provide enough evidence . . . to permit an inference that the [entity] has *chosen* an impermissible way of operating." *Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005) (emphasis added). "Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipality policy at issue, not a random event." *Id.* at 380.

To be "widespread," the municipal action must be "so permanent and well-settled that it constitutes a custom and practice." *LaPorta*, 988 F.3d at 986; *see also Monell*, 436 U.S. at 692

(describing a widespread practice as one that is "persistent," "permanent," and "well settled"). Only those municipal actions that are "so persistent . . . as to practically have the force of law" pass muster. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

The practice must be "so persistent and widespread as to practically have the force of law." *Id*. "The gravamen 'is not individual misconduct . . . but a *widespread* practice that permeates a critical mass of an institutional body.'" *Brown v. City of Chicago*, 2022 WL 4602714, at *36 (N.D. Ill. 2022) (emphasis in original) (quoting *Rossi v. Chicago*, 790 F.3d 729, 737 (7th Cir. 2015)).

A plaintiff "must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citation omitted). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006).

Staffing shortages, equipment inadequacies, and other forms of indirect evidence can give rise to a claim. But once again, reaching the standard is a difficult climb. "As applied to [an inadequate medical care] case such as this one, we look to see if a trier of fact could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system. And even if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them." *Dixon*, 819 F.3d at 348.

"The unifying theme in these decisions is the acknowledgment that the word 'widespread' must be taken seriously." *Phelan*, 463 F.3d at 789–90. Satisfying that requirement

15

requires more than lip service to the standard. "One broad, vague statement about an occurrence affecting other inmates in a detention facility does not support the inference of a 'widespread' custom." *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

Here, Plaintiff's brief declares that delays in treatment were "also experienced by numerous other detainees at the jail." *See* Pl.'s Resp., at 5 (Dckt. No. 78); *see also id.* at 8 ("[P]laintiff presents evidence of other detainees who each experienced delays between weeks or months after submitting a HSRF that should result in an urgent appointment.").

The number isn't so numerous. In his statement of facts, Plaintiff came forward with only five other inmates who experienced delays to receive extractions at Stroger. *See* Def.'s L.R. 56.1 Resp., at ¶¶ 15–19 (Dckt. No. 79). Five inmates (or six, including Plaintiff) is a generous take on the term "numerous."

And even then, the span of time waters down the number. The examples come from a period spanning from April 2017 to March 2019. *Id.* at ¶ 15 (March 2019); *id.* at ¶ 16 (October 2018); *id.* at ¶ 17 (April 2018); *id.* at ¶ 18 (June 2018); *id.* at ¶ 19 (June 2017); *id.* at ¶ 39 (April 2017). That's roughly two years. Basically, Plaintiff has come forward with a handful of examples – a few detainees each year, tops.

The examples appear especially insubstantial given the number of inmates who are incarcerated at Cook County Jail as a whole. Thousands of detainees are at Cook County Jail at any one time, with tens of thousands coming and going each year. *See* Cook County Government, Department of Corrections, https://www.cookcountyil.gov/service/department-corrections (last visited March 23, 2023) ("The Cook County Department of Corrections (CCDOC) is one of the largest single site county pre-detention facilities in the United States.

16

Primarily holding pre-trial detainees, the Department admits approximately roughly 100,000 detainees annually and averages a daily population of 9,000.").  That's a lot of teeth.

When evaluating frequency, the raw number of incidents is not the entire universe.  The *denominator* matters, too.  The percentage sometimes says more than the absolute number.

It's hard to imagine any problem at a large facility like Cook County Jail that *isn't* experienced by more than one inmate.  Given the numbers, problems are bound to repeat themselves.  If six examples are enough in a large institutional setting, *Monell* claims would be the rule rather than the exception.  It's hard to see how *Monell* would do much work.  Instead of a "guardrail[]," *Monell* would be less effective than a faded yellow line on the side of the road. *See J.K.J.*, 960 F.3d at 377.

In the grand scheme of things, five examples (six, if you include Plaintiff) is not much of a practice.  The incidents are "so few and far between that they could not plausibly be described as 'so persistent and widespread as to practically have the force of law.'"  *Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020) (quoting *Connick*, 563 U.S. at 61); *see also Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Three instances of prescription delays over nineteen months involving solely one inmate fail to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law."); *Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018) (holding that a "handful of incidents of misconduct," including three incidents of sexual contact, two incidents of inappropriate comments, and two allegations of harassment over two decades "is not enough to establish a custom or practice"); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) ("*Monell* claims based on allegations of an unconstitutional municipal practice or custom – as distinct from an official policy – normally require evidence that the identified practice or custom caused multiple injuries."); *Dixon*, 819

17

F.3d at 348 ("A plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision. This requires more than a showing of one or two missteps.") (internal quotation and citation omitted); *Rossi*, 790 F.3d at 737 ("[T]he gravamen is not individual misconduct . . . (that is covered elsewhere under § 1983), but a *widespread practice* that permeates a critical mass of an institutional body.") (emphasis in original); *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice."); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three.") (cleaned up); *Grieveson*, 538 F.3d at 774 (addressing "four incidents" experienced by a single inmate); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference."). A practice is not widespread if it took place only a handful of times.[1]

Apart from the six examples over two years, there isn't much else to go on. Plaintiff has offered a smattering of indirect evidence consisting of quotes from depositions and documents, but they don't get him very far. The testimony is abstract, and at a high level of generality. It

---

[1] The Seventh Circuit has not pinned down a minimum number of incidents necessary to constitute a widespread practice. *See, e.g.*, *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Although this court has not adopted any 'bright-line rules' defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three."); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). In fact, it has shied away from doing so. One possible analogy is a Lite-Brite, or one of those signs with scrolling text from flashing lightbulbs (like ticker sign, or a marquee sign outside a theater). There must be enough data points to show a discernible picture. A small sample set with a smattering of data points doesn't reveal very much.

does not support the notion that there is a widespread practice of delayed oral surgery appointments.

For example, Plaintiff points to a statement by the Cook County Director of Oral Health (Dr. Jorelle Alexander) in September 2013, five years before Plaintiff requested treatment. Dr. Alexander said that the process of scheduling dental appointments was "inefficient." *See* Defs.' L.R. 56.1 Resp., at ¶ 10 (Dckt. No. 79); *see also* 9/10/13 Alexander Email, at 1 (Dckt. No. 77-9).

Evidence about inefficiency – at a high level of generality – does not shed much light on whether there is a widespread practice of unconstitutional delays. That is, Plaintiff fails to connect abstract comments about inefficiencies in the scheduling system to his theory that oral surgery delays were widespread.

A reference to inefficiency doesn't reveal anything about how often delays happened, or how long they lasted. And in fact, inefficiency does not necessarily mean that delays happened at all. A process can be inefficient but on time. Imagine getting a dental exam and having one dentist per tooth.[2]

Plaintiff then puts forward evidence of the County's struggles to hire an on-site oral surgeon. *See* Defs.' L.R. 56.1 Resp., at ¶ 9 (Dckt. No. 79). Several County dental health administrators apparently tried and failed to bring an on-site oral surgeon back to the jail. For

---

[2] Taking a step back, a widespread practice of inefficiency, without more, would not cut it because inefficiency is not a constitutional violation. Again, there is no *Monell* claim without an underlying constitutional violation. *See Dean*, 18 F.th at 234 ("[I]t is usually necessary in *Monell* cases to introduce evidence of a prior pattern of similar *constitutional violations*.") (emphasis added). Inefficiency and unconstitutionality are not the same thing. Not even close. A practice can be inefficient but constitutional, or efficient but unconstitutional, or both, or neither. It's a long throw between inefficiency and unconstitutionality. One doesn't say much about the other. What's more, evidence about inefficiency does not move the ball when it comes to deliberate indifference, either, unless the municipality is aware that inefficient care leads to deficient care.

example, Dr. Ronald Townsend, a former chief of dental services, testified in 2011 that he was unable to hire an on-site oral surgeon because of budget constraints. *Id.*

Dr. Alexander had similar problems recruiting an on-site oral surgeon. *Id.* at ¶ 11. One candidate received an employment offer, but hiring fell through after significant concerns with past malpractice claims arose during the credentialing process. *Id.* There is also evidence that Dr. Alexander attempted to recruit an attending oral surgeon from Stroger to work at the jail, but this never materialized. *Id.*

Additionally, the jail seemingly did not have the necessary equipment to attract an oral surgeon. Dr. Alexander wrote in a 2016 email that the jail lacked a digital panoramic machine, an x-ray device used to capture the whole mouth in one image, which she described as "a necessity in the diagnosis and treatment of the patient." *Id.*; *see also* 5/2/16 Alexander Email, at 1 (Dckt. No. 76-9). "If we do not have a PAN we cannot have an oral surgeon practicing at Cermak," she wrote. *See* 5/2/16 Alexander Email, at 1. "No Pan, no oral surgeon." *Id.*

In that same email, Dr. Alexander also raised the jail's lack of a surgical handpiece. *Id.* at 2. She described the handpiece as "a necessity in the surgical treatment of the patient," without which an oral surgeon "will not work." *Id.*

Evidence about the jail's hiring problems and equipment shortages does not move the needle very far. An inability to hire an on-site oral surgeon and provide them with adequate equipment, without more, is not a constitutional violation. A labor shortage, standing alone, is not a sign of a constitutional violation. (It is all too common in the private sector, too.) The jail's hiring shortcomings do not amount to "systemic and gross deficiencies" because the jail implemented an alternative method of providing oral surgery care to detainees: referral to off-site care at Stroger.

None of Plaintiff's indirect evidence shows that the referral policy led to pervasively inadequate dental care. A lack of an on-site oral surgeon does not show whether there were delays as a result of the off-site referral process, or how often those delays occurred. It does not reveal whether there was a widespread practice of inflicting unnecessary pain through delayed oral surgeries.

That is, to the extent that the jail had "systemic and gross deficiencies" in its staffing and equipment, Plaintiff has failed to show that those deficiencies "effectively denied [inmates] access to adequate medical care." *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 (7th Cir. 2016); *see also Rossi*, 790 F.3d at 737 (affirming the district court's finding that a police lieutenant's general deposition testimony, which did not address quantity or frequency of the alleged widespread practice, "served more as a passing comment than evidence demonstrating a widespread practice").

Plaintiff next points to evidence that the transportation of inmates to Stroger posed an obstacle to their receiving timely and adequate dental care. That evidence consists of one 2016 email in which Dr. Alexander wrote, "we refer quite a few [to Stroger] monthly and transportation of inmates has been and will continue to be a challenge. Cermak is only allowed to move 10 patients in the am and 10 patients in the pm for transport to Stroger and we (dental) are lucky to get a spot or two out of the ten especially when there are more pressing medical needs." *See* Defs.' L.R. 56.1 Resp., at ¶ 13 (Dckt. No. 79); *see also* 4/8/16 Alexander Email, at 1 (Dckt. No. 76-10).

But this evidence suffers from the same shortcomings. It adds little to the mix and fails to connect the dots between the alleged inadequacies of the transportation policy and delays in inmates' dental care. A jury could not conclude from this single email that there were gross and

systemic deficiencies is the jail's transportation system. And even if it did, there is no evidence that transportation practices delayed surgery for any inmates or otherwise had any impact on care, which is of course what Plaintiff needs to support a claim about a widespread practice. *See Stockton*, 44 F.4th at 618 (finding that an inmate death was not connected to plaintiff's claims of inadequate medical staffing levels, noting that plaintiff's evidence did "not connect [plaintiff's] purported municipal practice to any inmate injury").

Finally, Plaintiff relies on the testimony of his expert, Dr. Lockhart. According to Plaintiff, Dr. Lockhart opined that the jail's "referral process merely becomes another reason for delayed care." *See* Defs.' L.R. 56.1 Resp., at ¶ 35 (Dckt. No. 79) (citing Lockhart Report, at 10 (Dckt. No. 76-23)). She concluded that there are "systemic delays for patients in need of oral surgery as a result of a common practice to refer the patient to the Stroger Oral Surgery Clinic." *See* Lockhart Report, at 3. And she further testified as to what she described as "systemic deficiencies in the oversight of dental care in the Division 10 dental clinic. *Id.* at 4.

But in the pages in question, Dr. Lockhart merely summarized the facts about Plaintiff's experience, and then slapped on the labels "systemic deficiencies" and "systemic delays." *See* Lockhart Report, at 3–4 (Dckt. No. 76-23). The report included no expert analysis of whether there is a widespread practice of inflicting unnecessary pain through the off-site referral program. A conclusory statement that it was "common" to wait weeks doesn't count. *Id.* at 3. That statement was supported by nothing, so it counts for nothing.

Dr. Lockhart also mused that Plaintiff's "delay to be treated was caused by poor oversight of the dental clinics and likely due to inadequate staffing." *Id.* at 4. That's not admissible expert testimony. Experts don't offer much value when they merely regurgitate the evidence and then offer a raw conclusion. She is over her skis, too. Dr. Lockhart may have

dental expertise, but she does not have expertise figuring out why Plaintiff waited 39 days for an extraction.

The record lacks evidence of a widespread practice, but that evidentiary gap does not necessarily doom the claim. On rare occasions, even a single incident could give rise to *Monell* liability if the risk is "so obvious that it compels municipal action." *See J.K.J.*, 960 F.3d at 381; *see also Bohanon*, 46 F.4th at 677 (collecting cases). But that's not this case, by a long shot. Plaintiff had to wait 39 days to receive a tooth extraction, allegedly because the jail adopted an off-site referral policy for certain oral surgeries. It is far from obvious that utilizing off-site oral surgeons will result in constitutional injury.

In the end, Plaintiff has not come forward with enough evidence to support a finding by a reasonable jury that Defendants engaged in the widespread practice of providing constitutionally deficient dental care.

## II.   Deliberate Indifference

Story's claim cannot survive summary judgment for a second reason, above and beyond the lack of evidence of a widespread practice. Plaintiff has not offered evidence that Defendants acted with deliberate indifference.

Under *Monell*, a plaintiff must show that a defendant acted with the "'requisite degree of culpability.'" *See J.K.J.*, 960 F.3d at 377 (quoting *Brown*, 520 U.S. at 404). More specifically, a plaintiff must offer evidence of deliberate indifference. *See LaPorta*, 988 F.3d at 987.

"This is a high bar." *Id.* "A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.*; *see also Dean*, 18 F.4th at 236 ("In short, a *Monell* plaintiff must show . . . that the municipality took the action with conscious disregard

for the known or obvious risk of the deprivation."); *Brown*, 520 U.S. at 410 ("'[D]eliberate

indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a

known or obvious consequence of his action."); *see also Bohanon*, 46 F.4th at 675 ("This is not

an easy showing."). Deliberate indifference "is a high bar 'because it requires a showing [of]

something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'"

*Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brown*, 670 F.3d 816,

821 (7th Cir. 2012)).

Deliberate indifference goes beyond a failure to act – a municipality's conduct must rise

to the level of criminal recklessness. *See Flores v. City of South Bend*, 997 F.3d 725, 729 (7th

Cir. 2021). "Negligence or even gross negligence on the part of the municipality is not enough."

*LaPorta*, 988 F.3d at 987.

In particular, proving deliberate indifference based on a widespread practice is a high

hurdle. "To establish deliberate indifference to the purportedly unconstitutional effects of a

widespread practice, [a plaintiff] must point to other inmates injured by that practice." *Stockton*,

44 F.4th at 617; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985).

"When a plaintiff chooses to challenge a municipality's unconstitutional policy by

establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series

of violations must be presented to lay the premise of deliberate indifference." *Palmer*, 327 F.3d

at 596; *see also Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019); *Chatham*, 839

F.3d at 685 ("*Monell* claims based on allegations of an unconstitutional municipal practice or

custom . . . normally require evidence that the identified practice or custom caused multiple

injuries.").

Plaintiff must show multiple injuries from which a jury could reasonably find that "'the plainly obvious consequences' of the practice 'would result in the deprivation of a federally protected right.'" *Stockton*, 44 F.4th at 617 (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)); *see also Brown*, 520 U.S. at 411; *Calderone v. City of Chicago*, 979 F.3d 1156, 1164–65 (7th Cir. 2020) ("One single incident cannot suffice; rather, [plaintiff] must show a series of constitutional violations.") (cleaned up).[3]

Based on the record at hand, Story has fallen far short of overcoming this high hurdle. The jail may not have been able to hire an on-site oral surgeon. And it may not have had adequate oral surgery equipment at the jail. But the jail implemented an off-site referral program so that inmates needing care could receive it at Stroger Hospital. And Plaintiff does not put forward sufficient evidence from which a jury could find that Defendants were deliberately indifferent to any potential unconstitutional consequences of this policy. There was no pattern of oral surgery delays, let alone a pattern of constitutional violations.

Again, "a plaintiff seeking to hold a municipality liable for a facially lawful policy generally must prove a prior pattern of similar constitutional violations resulting from the policy." *Dean*, 18 F.4th at 236. "[W]here the policy relied upon is not itself unconstitutional, *considerably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (emphasis in original) (quoting *Tuttle*, 471 U.S. at 824).

As the Court has discussed, Story unearthed only five other instances in a two-year period in which detainees received delayed dental care. Counting him, that's six detainees. Six

---

[3] The number of other violations speaks to two elements of a *Monell* claim about a custom or practice. The municipal action must occur repeatedly, or else it is not a "widespread practice." Also, the action must affect a number of inmates to make the violation sufficiently obvious to give rise to a finding of deliberate indifference. The number of violations can do double duty.

oral surgery delays could not have put Defendants "on notice of the unconstitutional consequences of [their] policy, such that its continued adherence to the policy might establish the conscious disregard for the consequences of [their] action – the deliberate indifference – necessary to trigger municipal liability." *See Dean*, 18 F.4th at 236 (cleaned up); *see also Stockton*, 44 F.4th at 617. A handful of incidents fails to lay the foundation for deliberate indifference.

The record does not include any other evidence – director or indirect – that Defendants deliberately delayed or withheld dental care from Plaintiff, either. Cook County Health Administrators' desire to hire an on-site oral surgeon and improve inmate transportation capacity does not show that Defendants knew that constitutionally timely oral surgery appointments "were not happening with such frequency that it ignored an obvious risk of serious harm." *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 967 (7th Cir. 2019).

The fatal flaw in Plaintiff's case is that he has not shown that the referral policy was a constitutionally inadequate alternative method of providing care. *Id.* ("Walker has not shown that the standby options of Stateville's on-site medical care facilities and the nearby hospital were not sufficient as a backup plan."). Absent evidence that Defendants were on notice that the referral policy was likely to cause constitutional violations, this Court must grant summary judgment to Defendants on the issue of municipal fault. *Id.*

\*     \*     \*

In sum, Plaintiff has not presented sufficient evidence of a widespread practice, or evidence of deliberate indifference. So he can't get to trial.

This Court acknowledges that another judge in this District has reached a different conclusion on a very similar issue, based on a substantially similar body of evidence. *See*

*Whitney v. Khan*, 2021 WL 105803 (N.D. Ill. 2021) (addressing the policy of referring detainees to Stroger Hospital for dental extractions). This Court fully respects that thoughtful decision, which denied summary judgment in favor of the class of plaintiffs, but simply sees things a little differently and lands in a different place.

It is no answer to say that this Court should simply send this case to the jury, and let the jury figure it out. To get there, Plaintiff has to pass through the checkpoint of summary judgment. To get past the gate, Plaintiff has the burden of showing that he has enough evidence to support a finding in his favor by a reasonable jury.

The Supreme Court requires lower courts to uphold the "rigorous requirements" of *Monell*, so that municipal liability does not "collapse[] into *respondeat superior* liability." *See Brown*, 520 U.S. at 405; *see also LaPorta*, 988 F.3d at 987 ("These requirements . . . must be scrupulously applied in every case alleging municipal liability."). Lower courts must ensure that litigants stay within the guardrails of *Monell*. And if they don't, they have reached the end of the road.

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted.

Date: March 23, 2023

_____
Steven C. Seeger
United States District Judge